## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JAMES STEWARD,**                                    **CASE NO.**

     **Plaintiff,**

**v.**

**IKEA US RETAIL LLC,**

     **Defendant.**

_____/

## COMPLAINT

Plaintiff, JAMES STEWARD, hereby sues Defendant, IKEA US RETAIL LLC, and alleges:

## JURISDICTION

1.      This is an action brought under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000e et seq., 42 U.S.C. §1981, Chapter 448, Florida Statutes, the Family and Medical Leave Act (FMLA) of 1993, codified at 29 U.S.C. §§2612, 2624, and the Americans with Disabilities Act (ADA), codified at 42 U.S.C. § 12101, et seq.

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights claim jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

3.     This is an action involving claims which are, individually, in excess of Seventy- Five Thousand Dollars ($75,000.00).

## THE PARTIES

4.     At all times pertinent hereto, Plaintiff, James Steward has been a resident of the State of Florida and employed by Defendant.  Plaintiff is a member of a protected class because of his actual and/or perceived disability and because he reported unlawful employment practices and has been retaliated against thereafter.

5.     At all times pertinent hereto, Defendant, Ikea US Retail LLC, has been organized and existing under the laws of the United States.  At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above.  Defendant is Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

6.     Plaintiff has satisfied all conditions precedent to bringing this action.

## STATEMENT OF THE ULTIMATE FACTS

7.     Plaintiff began his employment with Defendant on June 26, 2011 and, at all times pertinent to this action, worked as an Operations & Payments Leader at

Defendant's Ikea store in Tampa, FL.  He was wrongfully terminated on June 12, 2024.[1]

8.     Plaintiff was a loyal and dedicated employee.

9.     Despite his stellar work performance during his employment with Defendant, Plaintiff was subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of his actual and/or perceived disability and because he reported Defendant's unlawful employment activities and was subject to retaliation thereafter.

10.     The disparate treatment and retaliation came at the hands of specifically but not limited to Market Manager, Andru Hooks, People & Culture Manager (HR), Kelly Henry, People & Culture Generalist (HR), Kim Duro, Operations and Payments Manager, Bernardo Crespo, Customer Experience Manager, Laetitia Gouverneur, and Customer Resolutions Manager, Jennifer Kurella.

11.     Plaintiff suffers from two serious medical conditions of which Defendant was aware, one that required surgery.

12.     On August 15, 2021, Plaintiff intended to accept a severance package from IKEA due to the toxic work environment he had been experiencing. Plaintiff faced issues including, but not limited to, a lack of professionalism among leadership

---

[1]     Plaintiff intends to file additional claims including those for his termination after administrative exhaustion is complete.

and pressure from management not to report concerns. Hooks, however, convinced Plaintiff not to accept the severance package and assured him "things" would get better.

13.    On or about August 16, 2021, Customer Service Leader Shanika Westford filed a complaint stating that Manager Jennifer Kurella made a racist remark. In response, Kurella claimed that she could not recall making such a remark, stating she was "too doped up" on migraine medication at the time.

14.    On or around August 16, 2021, Westford discussed the incident with Plaintiff in which she informed Plaintiff that she communicated these concerns to Henry and Hooks.

15.    On August 16, 2021, Plaintiff engaged in a discussion with Customer Experience Manager Rich Gasser and Henry concerning Plaintiff's observations of potential symptoms of intoxication exhibited by Kurella in the workplace.

16.    On or around that same day, Plaintiff discussed with Hooks, Henry, and Gasser that Westford had informed him of a racist remark made by Kurella. Plaintiff communicated that Kurella claimed to have experienced memory loss due to medication she was taking at the time the remark was made.

17.    On August 18, 2021, Plaintiff provided a follow-up statement to HR regarding the complaint in which he expressed that Henry and Hooks did nothing about the racist comment by Kurella. The statement also addressed disrespectful

remarks made during a Customer Service Leadership meeting about employee Asante Moore, who is African American. Additionally, Plaintiff communicated that disparaging comments were made in the same meeting regarding employee, Madison Crane's "medication" and mental health issues.

18.     On August 22, 2021, Henry informed Plaintiff via email that she would follow up with him that week regarding the matter.  When Plaintiff did not receive a timely follow-up regarding his complaints, he eventually had to communicate again via email to have a meeting set up.

19.     On November 10, 2021 Plaintiff met with Gasser to discuss ongoing retaliation by Kurella, including a noticeable change in her behavior towards him after he reported her discriminatory comments, such as a lack of communication and disregarding Plaintiff, even during team meetings.

20.     On February 16, 2022 a Customer Service Meeting was held and Plaintiff distributed and presented a Racism and Employee Turnover handout to everyone in attendance including all leaders and managers.

21.     On April 23, 2022, Gasser emailed Plaintiff attachments to the Observable Behavior Report and the For-Cause and Post-Incident Drug & Alcohol Testing Procedure after several discussions about how to proceed on the topic of Jennifer Kurella's possible workplace intoxication.

22.    On January 21, 2023, Crespo accidentally forwarded an email thread from Kurella to Plaintiff, where Kurella stated on January 19, 2023, " it's time for jimmy [Plaintiff] to face some conflict". Plaintiff subsequently communicated this information to Henry and Duro.

23.    On February 13, 2023, Plaintiff had a meeting with Duro where he informed her of his intention to submit a complaint on the internal IKEA complaint system, iSpeak, if working conditions involving retaliation did not improve.

24.    On February 16, 2023, Plaintiff sent a rough draft of the iSpeak complaint to Duro listing examples of discrimination and differential treatment toward employee Crane, who had a documented history of mental health issues.

25.    On February 21, 2023, a focus group was held with Operations and Payments Leader, Kathleen Schmidberger, and Team Leader, Luis Delgado, during which the toxic workplace environment to Duro, who was also in attendance.

26.    On March 6, 2023, Plaintiff filed a complaint addressing the unfair application of policies based on racial identity, attesting to an ongoing pattern of a differential evaluation or treatment of workers solely based on race. Plaintiff provided examples illustrating how white co-workers Aidan Arnold, Danyel Humphrey, and Elaine Adkins were treated more favorably as compared to African American co-workers Ivory Boswell, Jaqueline Hardley, and Sascha Williams.

27.    Three days later, on March 9, 2023, Plaintiff spoke to Gasser regarding the issue of favoritism being shown towards white co-workers over co-workers of color.

28.    On March 11, 2023, Plaintiff verbally informed Crespo of a concerning issue raised by Delgado. Delgado expressed feeling targeted based on his race due to an allegation regarding an inappropriate personal relationship with an employee, Shadey Rodriguez. Delgado stated that Gasser falsely claimed to have witnessed the two entering a vehicle together.

29.    On March 13, 2023, Plaintiff submitted an email to Duro reporting retaliatory actions taken by Kurella against him after he reported allegations of possible misconduct and discrimination by her.

30.    On March 24, 2023, Plaintiff emailed Duro to request a meeting with him and Delgado to discuss previous and current issues regarding his work and Kurella.

31.    On March 26, 2023 Plaintiff sent an update of his complaint to iSpeak to Duro regarding the retaliation he had been experiencing.

32.    On March 29, 2023 Plaintiff emailed his complaint to Duro, with Delgado copied, addressing potential issues of racism and discrimination within the workplace. Plaintiff outlined specific concerns regarding what he perceived as racially motivated decision-making adversely affecting employees of color. He

emphasized that the decision not to provide seating for employees was based on concerns about the optics of African American employees sitting on the job. This decision created a significant safety hazard, particularly concerning the risk of heat-related illnesses and the need for employees to sit on occasion. Without question, the decision not to provide seating was motivated by race.

33.    On March 30, 2023, a meeting was held with Plaintiff, Duro, and Delgado to discuss the concern about retaliation against him and the discrimination against other employees. During the meeting, Delgado disclosed to Duro that, as a Hispanic individual, he felt targeted based on his race following an allegation suggesting a personal relationship with an employee under his supervision. Delgado claimed that Gasser had allegedly fabricated a narrative suggesting he had observed Delgado and Rodriguez entering a vehicle together, and that something more than business was going on.

34.    On April 2, 2023, Plaintiff emailed Duro an official complaint detailing examples of discrimination and differential treatment towards employee Crane by Kurella, specifically related to Crane's mental health issues. The complaint also addressed retaliatory actions by Kurella against Crane for reporting a work-related injury, as well as Delgado's report of a recent interaction between Kurella and Shakeya Johnson, an African-American employee, which Delgado stated caused

Shakeya to feel uncomfortable. Plaintiff subsequently forwarded this complaint to Hooks on September 5, 2023.

35.    The same day, Plaintiff emailed Duro to also attest that he suspected a broader pattern of falsehoods, including the fabricated narrative by Gasser regarding Delgado and Rodriguez

36.    On April 17, 2023, Plaintiff emailed Duro regarding scheduling issues caused by his business trip to the IKEA Foundation hub. Plaintiff reported that he was instructed to "pay back" the time he was away on the weekend days, which he thought was or could be retaliatory.

37.    On May 13, 2023, an HR Matter Closure was issued, concluding the investigation into Plaintiff's complaints without adequate remedial action. Following this closure, Plaintiff observed continued retaliatory actions against him. Despite efforts to resolve these issues internally, the retaliation persisted. Examples of the continued retaliatory actions include but are not limited to, Plaintiff's policy inquiries being ignored and a lack of resolution regarding Plaintiff's complaints.

38.    On May 30, 2023, in response to Duro's request for information as to what Plaintiff would like to see happen in regards to Kurella, Plaintiff emailed suggestions such as hosting the "Mosaic: African Descent Co-worker Resource Group" and readings such as "Inclusive Conversations: Fostering Equity, Empathy, and Belonging across Differences" by Mary-Frances Winters, "How to Be an

Antiracist" by lbram X. Kendi, and "White Fragility: Why It's So Hard for White People to Talk About Racism" by Dr. Robin DiAngelo.

39.    The following day, on June 1, 2023, Plaintiff was assigned duties as a cashier rather than his designated role as Operations and Payments Leader. Similarly, Schmidberger, who was a close friend of Plaintiff, was also scheduled as a cashier instead of her role as Operations and Payments Leader.

40.    On June 6, 2023, Plaintiff received an undue F2F documentation write up for being "unaware of the actions of co-workers" following an incident where a cashier made an improper purchase.

41.    On June 12, 2023, Plaintiff sent an email to Duro regarding ongoing retaliation stemming from the complaint initially made to Hooks, Henry, and Gasser in August 2021. Duro's response implied that Plaintiff should make more of an effort to communicate beyond the usual pleasantries and did not address the issue of retaliation.

42.    On June 22, 2023, Plaintiff emailed Duro requesting assistance with submitting the report referenced above to iSpeak by August 13, 2023.

43.    On June 28, 2023 Duro held a meeting with Plaintiff, Kurella, and Gasser present to discuss an action plan to resolve the issues in the work environment.

44.    After the meeting Duro instructed Plaintiff to report his concerns directly to Kurella with the understanding that the issues were solved. Plaintiff expressed he did not feel comfortable reporting his issues to Kurella and subsequently sent an email to Duro notifying her that he was concerned for his well-being and safety.

45.    On July 21, 2023, Plaintiff received an email reply from Duro with Henry copied that stated "This is an inappropriate email and borders on malicious gossip." Duro still hadn't addressed the issue of retaliation.

46.    Plaintiff subsequently replied and stated, "Thanks Kim I agree that the information that I submit on 8/13/23 should be focused on the documentation and thank you for your guidance through the process." This was regarding the internal iSpeak complaint submission.

47.    On August 8, 2023, Team Lead Christie Graham stated that, due to Plaintiff's filing of complaints, she would no longer trade shifts with him if he ever needed it. Notably, Crespo witnessed this conversation and did not address it as unfair or retaliatory.

48.    On August 15, 2023 Plaintiff submitted a complaint via iSpeak concerning ongoing retaliation and emphasized the necessity of investigating and addressing broader issues within the work environment. He specifically requested an action plan to address and rectify these concerns. Despite these efforts, the case

was closed without any actions taken or solutions implemented to resolve the identified problems.

49.    On September 5, 2023 a meeting was held with Hooks and Henry to discuss the iSpeak complaint regarding retaliation, but the discussion primarily focused on Gasser. During the meeting, Hooks instructed Plaintiff to email any "hair-raising" issues but later implied that Plaintiff should cease such communications. Consequently, Plaintiff refrained from continuing to send emails following this communication.

50.    Notably, it was brought to the Plaintiff's attention by Team Lead, Emily McGuire, that Henry was unaware of the definition of the term 'gaslighting' when McGuire filed a complaint against Kurella, accusing her of gaslighting. Similarly, the Plaintiff had previously filed a complaint against Kurella for gaslighting him. At no point did Henry inform Plaintiff that she was unaware of the definition of 'gaslighting.' This raises concerns about the thoroughness of the investigation into all complaints without a proper understanding.

51.    On September 17, 2023, Plaintiff received a case closure letter via email concerning the iSpeak complaint, but no action plan was provided to address the issues raised. Subsequently, Plaintiff responded, expressing his desire to keep the complaint case open.

52.    On October 5, 2023 Plaintiff emailed Henry and Hooks regarding Schmidberger and Delgado, stating his intention to ensure that Kathleen and Luis have the opportunity to speak with Henry and Hooks.

53.    On or around February 7, 2024 Plaintiff requested a follow up from Henry regarding his complaint on ISpeak, since no action plan had been implemented and he was still being retaliated against.

54.    On February 18 2024, Plaintiff reported possible intoxication by Kurella to Duro and Duty Manager Josh Power. Plaintiff attested that he observed signs of possible intoxication in Kurella, including mumbling and appearing medicated. Additionally, Plaintiff conveyed to Duro that Kurella had informed McGuire that she was likely to pass out.

55.    On February 20, 2024, a follow-up meeting regarding the iSpeak complaint was held with Hooks and Henry. The discussion on the iSpeak complaint was minimal, and the only solution proposed was for IKEA to cover the cost of a dinner for the Customer Service Leaders. During the meeting, Plaintiff requested that IKEA adopt a policy to address workplace bullying and provided a copy of his rough draft of the proposed policy.

56.    On March 12, 2024, Plaintiff received a Final Corrective Action, which is a last warning write up before termination. Plaintiff disagreed with the Corrective Action and participated in an Open Door Corrective Action Appeal with Crespo and

Hooks. Plaintiff also sent an email to Hooks detailing reasons why he believed the Final Corrective Action was unjustified and communicated to Henry, Duro, Crespo, and Hooks that he perceived this action as retaliatory.

57.    During the Open Door Corrective Action Appeal, Plaintiff disclosed his medical condition of being a recovering alcoholic and that he was a member of Alcoholics Anonymous to Crespo.

58.    On March 13, 2024, Plaintiff met with Henry to express his desire to advocate for McGuire, who was being discriminated against concerning her ADA-approved accommodation. McGuire had shared some of her issues with Plaintiff, and he assured her that he would assist in any way possible.

59.    On March 16, 2024, Plaintiff contacted 1-877-212-HR4U, which is a number to Defendant's Human Resources department, with policy questions, and was instructed to email the US GBO Hub.

60.    On March 18, 2024 Plaintiff emailed the US GBO Hub, and he received a response from Corporate Human Resources representative Stephanie Baker, stating  that  Henry should be able to address Plaintiff's questions..

61.    On March 21, 2024, during the Corrective Action Final appeal process with Crespo, issues of retaliation related to Plaintiff's discrimination complaints were discussed. When the discussion turned to Plaintiff's psychologist, Crespo

remarked that Plaintiff 'shouldn't listen' to his psychologist because they don't know what's going on.

62.    On March 21, 2024, Plaintiff emailed Crespo to follow up on the discussion regarding retaliation stemming from his reporting of discrimination issues.

63.    On March 31, 2024 during the Corrective Action Final appeal process with Hooks, they discussed retaliation related to Plaintiff's discrimination/retaliation complaints. Hooks stated that an IKEA co-worker should be "falling off the walls" or "smell" before reporting possible workplace intoxication. Hooks also told Plaintiff that he deserved the retaliation described in the iSpeak complaint. Additionally, Hooks expressed frustration about the time it took to research Plaintiff's complaints and told Plaintiff that there was nothing there.

64.    On this same day, Plaintiff disclosed his medical condition of being a recovering alcoholic and part of Alcoholics Anonymous to Hooks.

65.    On April 2, 2024, Plaintiff sent a notification of intent to file EEOC complaint regarding retaliation email to Henry.

66.    On April 9, 2024, the result of the Corrective Action Appeal process was communicated to Plaintiff by Henry, indicating that the Corrective Action Final would be final and binding.

67.   Notably, although Henry verbally acknowledged Plaintiff's questions to the US GBO Hub, she did not provide answers to those questions.

68.   On April 13, 2024, Plaintiff emailed Henry, referencing his advocacy for McGuire's situation. In his email, he emphasized the seriousness of the potential legal violations related to the Americans with Disabilities Act (ADA).  Plaintiff also expressed significant concern about the reported retaliatory culture at IKEA Tampa, which he believed might be discouraging Emily McGuire from coming forward.

69.   On April 15, 2024, Plaintiff submitted another complaint via iSpeak regarding Hooks' comments that Plaintiff deserved the retaliation described in his initial iSpeak complaint due to his complaints

70.   On April 16, 2024, Plaintiff emailed Henry addressing the refusal to address his legitimate inquiry raises concerns about adherence to established policies and procedures.

71.   On or around April 19, 2024, Plaintiff received an email from Henry offering to answer his questions in person, but a meeting was never scheduled to address the Plaintiff's questions.

72.   Notably, Plaintiff's ongoing reassignment to the less desirable position of cashier significantly limited the time available for his regular tasks, unlike roles in other Customer Service departments that offered greater flexibility. Efforts to seek clarification about this new scheduling went unanswered.

73.     On April 17, 2024, Plaintiff underwent Hydrocelectomy surgery and subsequently took medical leave under the FMLA for six weeks. Upon returning to work, Plaintiff presented an accommodation letter specifying, among other restrictions, that he should not be required to stand, push/pull, lift over 25lbs, or squat.

74.     Despite this accommodation letter, the Defendant assigned Plaintiff to cashier and other shifts that did not comply with the specified accommodations. These and other actions against him showed that he was the victim of retaliation for taking this leave under the FMLA.

75.     Plaintiff filed a charge of discrimination/retaliation with the EEOC in May 2024 which was investigated under EEOC # 511-2024-02316 and closed 6 days later with a Notice of Rights dated May 9, 2024.

76.     Notably, Plaintiff also submitted complaints to OSHA concerning issues of workplace safety, intoxication in the workplace, and retaliation, among other concerns.

77.     On June 6, 2024, Plaintiff filed a formal retaliation complaint against Duro for her behavior during his interview that same day, where she appeared impatient and dismissed his concerns. Additionally, the Plaintiff raised concerns about an unsettling comment Duro made earlier that day during the ED&I Forum, in the presence of multiple employees. When a co-worker asked about including

banned books in a shared document, Duro remarked, 'until someone complains.' Given the Plaintiff's recent history of filing complaints against Duro and others, he perceived the remark as being directed towards him.

78.    On June 8, 2024, Plaintiff requested an independent investigation due to concerns about potential bias in the handling of his complaints. He believed it would be more appropriate for an independent party or a higher-level HR representative to conduct the investigation to ensure impartiality and fairness. This request was not adequately addressed, further raising the Plaintiff's concerns about the integrity of the investigation process.

79.    On June 10, 2024, Plaintiff raised questions and concerns about potential violations of the National Labor Relations Act (NLRA) to Henry via email. These concerns pertained to his right to engage in concerted activities for mutual aid and protection.

80.    On June 12, 2024,[2] defendant wrongfully terminated Plaintiff in retaliation for reporting Defendant's unlawful employment activities, the filing of his charge and due to his actual and or perceived disability and record of impairment.

81.    Plaintiff's termination paperwork stated that he was terminated for making a 'baseless and dishonest' claim against a co-worker. Specifically, the

---

[2]    As stated above, Plaintiff's termination claim will be added after administrative exhaustion is complete.

18

paperwork cited that the Plaintiff claimed 'on May 30, 2024, at 1:59 pm, I [Plaintiff] said hello to a manager who did not respond.' This allegation against the manager, Kurella, was investigated and deemed dishonest and made in bad faith, as the situation described by the Plaintiff did not occur."

82.     On June 20, 2024, as part of the Open Door Process, the Plaintiff inquired with Crespo about the reasoning behind his termination, specifically questioning the disbelief of his claim. Crespo confirmed that the termination was based on the determination that his claim was not believed.

83.     On June 27, 2024, Plaintiff also inquired with Gouverneur about the reasoning behind his termination, specifically questioning the disbelief of his claim. Gouverneur confirmed that the termination was based on the determination that his claim was not believed.

84.     Notably, Plaintiff's claim can be verified by viewing the surveillance footage.

85.     Plaintiff has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services.  Defendant should be made to pay said fee under the statutes referenced above.

## COUNT I
## PRIVATE WHISTLEBLOWER RETALIATION

86.     Paragraphs 1 through 85 are incorporated herein by reference.

87.    This is an action brought under §448.101, et seq., Florida Statutes.

88.    As set forth in greater detail above, during the course of Plaintiff's employment, Plaintiff objected to certain practices of Defendant that were in actual or suspected violation of laws, rules and/or regulations.

89.    As a result of Plaintiff' objections, he was fired.

90.    Plaintiff was terminated because he engaged in protected behavior. Specifically, Plaintiff objected to, or refused to participate in, any activity, policy, or practice of Defendant which is in violation of a law, rule, or regulation and/or reported the violation and gave Defendant an opportunity to correct the problem. Instead of correcting the problem, it got worse and Plaintiff suffered ongoing retaliation until he was fired for said reporting.

91.    The disclosures made by Plaintiff are protected under §448.102, Florida Statutes.

92.    As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and likely will continue in to the future. Plaintiff is entitled to equitable/injunctive relief under this count.

20

## COUNT II
## <u>DISABILITY DISCRIMINATION</u>

93.     Paragraphs 1 through 85 above are re-alleged and incorporated herein.

94.     This count sets forth a claim for discrimination on the basis of Plaintiff's actual or perceived mental or physical disability and/ or record of impairment, brought under Chapter 760, Florida Statutes, and 42 U.S.C. §12101, et seq.

95.     Plaintiff has been a victim of discrimination on the basis of actual or perceived disability and/or record of impairment. During the course of Plaintiff's employment by Defendant, Plaintiff was treated differently than similarly situated employees who are non-disabled, not perceived as disabled, or do not have a comparable record of impairment to Plaintiff.

96.     Defendant is liable for the differential treatment and its refusal to accommodate Plaintiff and engage in the interactive process with him, which adversely affected a term, condition, or privilege of Plaintiff's employment with Defendant as those terms are used in the applicable statutes.

97.     Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

98.    In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were disability/perceived disability-based and in violation of the laws set forth herein.

99.    The discrimination complained of herein affected terms, conditions, and privileges of Plaintiff's continued employment by Defendant. The events set forth herein led, at least in part, to adverse employment actions against Plaintiff up to and including his termination.

100.    Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon disability or perceived disability, under the laws cited herein.

101.    As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and likely will continue in to the future. Plaintiff is entitled to equitable/injunctive relief and to punitive damages under this count.

## COUNT III
## <u>VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT</u>

102.    Paragraphs 1 through 85 are re-alleged and are incorporated herein by reference.

103.    This is an action against Defendant for retaliating against Plaintiff due to Plaintiff's use of protected leave time as set forth more fully above. This is thus a retaliation claim.

104.    After taking leave for serious health conditions, Defendant harassed Plaintiff and took adverse personnel actions against Plaintiff for using leave.

105.    Plaintiff was denied rights and benefits conferred by the FMLA and was terminated after taking protected leave.

106.    Defendant's violations of the FMLA were willful.

107.    As a direct and proximate result of Defendants willful, wanton, and malicious acts described in part above, Plaintiff has sustained damages for the loss of employment, as well as the security and peace of mind it provided.  Plaintiff has incurred damages for lost wages, and other damages attendant with the loss of his job.  These damages have occurred in the past, are occurring at present and will continue in the future.

## COUNT IV
## RETALIATION

108.   Paragraphs 1 through 85 are re-alleged incorporated herein by reference.

109.   This is an action against Defendant for unlawful retaliation after Plaintiff reported unlawful employment practices adversely affecting him under Chapter 760, Florida Statutes and 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981a.

110.   Defendant is an employer as that term is used under the applicable statutes referenced above.

111.   The foregoing unlawful actions by Defendant were purposeful.

112.   Plaintiff voiced opposition to unlawful employment practices during his employment with Defendant and has been the victim of retaliation thereafter.

113.   The events set forth herein have led, at least in part, to adverse actions against Plaintiff.

114.   Plaintiff is a member of a protected class because he reported unlawful employment practices and has been the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

115.   As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss

24

of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, lost opportunities, loss of capacity for the enjoyment of life, and other tangible and intangible damages.  These damages are continuing and are permanent.  Plaintiff is entitled to injunctive/equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a)    that process issue and this Court take jurisdiction over this case;

(b)    that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)    enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)    enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

25

(e)    enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)    award Plaintiff interest where appropriate; and

(g)    grant such other further relief as being just and proper under the circumstances.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Dated this 7th day of August, 2024.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801
Marie@mattoxlaw.com
Secondary emails:
marlene@mattoxlaw.com
michelle@mattoxlaw.com
discovery@mattoxlaw.com

ATTORNEYS FOR PLAINTIFF